**PENNSYLVANIA RAILROAD COMPANY, the New York Central Railroad Company, the Pittsburgh and Lake Erie Railroad Company, Plaintiffs,**

v.

**The UNITED STATES of America and the Interstate Commerce Commission, Defendants,**

and

**Waterways Freight Bureau, American Commercial Barge Line Company, Mississippi Valley Barge Line Company, Ohio River Company and Union Barge Line Corporation, Intervening Defendants.**

**Civ. A. No. 30485.**

United States District Court
E. D. Pennsylvania.
March 8, 1962.

Paul R. Duke, Philadelphia, Pa., Louis T. Duerinck, Chicago, Ill., for plaintiffs.

Robert S. Burk, Washington, D. C., Sullivan Cistone, Philadelphia, Pa., for defendants.

David W. Scully, Philadelphia, Pa., William Y. Wildman, Chicago, Ill., for intervening defendants.

Before FORMAN, Circuit Judge, and FREEDMAN and LUONGO, District Judges.

FREEDMAN, District Judge.

This suit calls on us to review an order of the Interstate Commerce Commission dealing with the competing claims of rail carriers and barge lines as to the appropriate charges for the shipment of pig iron from Neville Island (in the vicinity of Pittsburgh, Pennsylvania) to Louisville, Kentucky.[1] The rate concerns shipments by one producer, Pittsburgh Coke and Chemical Company, to one purchaser, the International Harvester Company.[2]

The rail carriers filed traffic schedules proposing a rate of $4.61[3] per gross ton.[4] The operation of the schedules was suspended upon protest of the Waterways Freight Bureau and thereafter their effective date was voluntarily postponed by the rail carriers until June 11, 1961. On May 31, 1961, the Commission, Division 2, filed its Report, Commissioner Freas dissenting, finding that the proposed rate was not shown to be just and reasonable, without prejudice to the establishment of a rate of $4.99. The Commission accordingly entered an order requiring the proposed schedules of the rail carriers to be cancelled. On September 25, 1961, the Commission, Division 2, acting as an appellate division, denied the petition of the rail carriers for reconsideration and in effect ordered its decision carried out, effective November 10, 1961.

The rail carriers thereupon filed the present complaint on November 6, 1961, seeking to set aside the Commission's order.[5]

On plaintiff's motion we granted a preliminary restraining order on November 6, 1961, which the parties permitted to expire on November 16, 1961, because in the meanwhile, on November 14, 1961, the Commission postponed the effective date of its decision until further order. The case now is before us on final hearing.

The report of the Commission enters in some detail upon the items which go to make up the charge in each mode of shipment. It is not necessary, however, to review these factors, for it is evident from the report of the Commission that $4.61 is the fair and reasonable rate unless there should be added to it the charge of 38 cents, consisting of 28 cents for switching at point of origin and 9.7 cents for weighing at point of origin (the total of which the parties have described generally as 38 cents).

It is clear beyond doubt from the Commission's report that the charges for switching and weighing at point of origin, totalling 38 cents, have been absorbed by the shipper. (Report of Commission, pp. 9, 12.)[6]

1. Interstate Commerce Commission Investigation and Suspension Docket No. 7431, Pig Iron—Neville Island, Pa., to Louisville, Ky.

2. The Commission's report specifically states: "Presently, it [International Harvester Company] is the only Louisville receiver of the consignor's pig iron." The report goes on to say: "It appears, however, that inquiry has been made concerning barge-line shipments in the future to the American Radiator and Standard Sanitary Corporation at Louisville." Nothing is said, however, as to the possible effect of such inquiry or how serious it may have been. (p. 2.)

3. The original rate proposed was $4.41. Because of an increase in barge line rates of 20 cents in the interval between the original proposal and the hearings before the Interstate Commerce Commission, the proposed rate was increased to $4.61 and was so considered by all parties and the Commission. (See Report of Commission, p. 3.)

4. The rate is based on pig iron moved in single shipments of not less than 600 gross tons, minimum 140,000 pounds per car, on one bill of lading, from one consignor at one origin to one consignee at one destination on one day.

5. The complaint was filed pursuant to 28 U.S.C.A. §§ 1336, 1398, 2284 and 2321–2325.

6. Indeed, the report of the Commission (p. 9) indicates that the weighing charge may well be an unreal item.

The Commission expressly found that "the proposed rate appears to be compensatory". (Report of Commission, p. 10). Since this is so, there is no reason for cancelling the proposed schedule, as the Commission did. Manifestly, under the circumstances which would prevail under the Commission's order—i. e., a charge of $4.99 by the rail carriers—the shipment of pig iron from Neville Island, Pa., to Louisville, Ky., would continue to be made by barge lines exclusively because of the advantage which they have had in the absorption by the shipper of the charges of 38 cents for switching and weighing at point of origin. The consignee, who controls the manner of shipment, will not select a rail carrier when by doing so it will incur an additional charge of 38 cents. The proof of this obvious fact lies in the experience of the parties during the period from April 15 to October 15, 1959, when the rate by rail carrier was $4.72 and the rate by barge line was $4.78. During that time the rail carriers failed to obtain any of the traffic. They are not participating in any of it now (Report of Commission, p. 12), and substantially all of the traffic has moved over the barge lines for some years. (Report of Commission, p. 3.)

The artificial increase of the rail carriers' rate to $4.99 by adding the charges of 38 cents could be justified only if their proposed rate of $4.61 was a destructive competitive practice contrary to the National Transportation Policy. The 1958 amendment to the Interstate Commerce Act embodied in § 15a(3) (49 U.S.C.A. § 15a(3)), provides: "In a proceeding involving competition between carriers of different modes of transportation * * * the Commission, in determining whether a rate is lower than a reasonable minimum rate, shall consider the facts and circumstances attending the movement of the traffic by the carrier or carriers to which the rate is applicable. Rates of a carrier shall not be held up to a particular level to protect the traffic of any other mode of transportation, giving due consideration to the objectives of the national transportation policy declared in this chapter and chapters 8, 12, 13 and 19 of this title."

■ We follow the view of Circuit Judge Hincks in New York, New Haven & Hartford R. R. Co. v. United States, 199 F.Supp. 635, 642 (D.C.Conn.1961), that the intention of Congress in adopting the 1958 amendment was that rates of the carrier should not be held up to a particular level to protect the traffic of another mode of transportation unless this would be contrary to the National Transportation Policy because of a "destructive competitive practice", such as the setting of rates so low as to be harmful to the proponent as well as his competitor, or would deprive a competitor of the "inherent advantage" of being the low-cost carrier (supra, p. 642). Here the Commission itself found that there were no factors present of "destructive competitive practice" or of "inherent advantage". In fact, it found to the contrary. As to "destructive competitive practice", the Commission expressly found that " * * * it is not established * * * that the protestants can not compete as total charges equal to those by rail." (Report of Commission, p. 12.) As to the "inherent advantage" factor, the Commission rejected the claim that it was established. Thus it stated: "From the evidence presented, because of incomplete cost data over the respondents' routes and the absence of actual operating costs over the complete routes of the protestants, we are unable to determine which constitutes the low-cost mode of transportation for this traffic." (Report of Commission, p. 9.) Again: "As stated, it is not established that the rail-water-rail movement is the low-cost mode * * we are persuaded that there is no sound basis for a finding that a differential under the rail rate is required to permit the barge lines to compete effectively for this traffic." (Report of Commission, p. 12.)

■ In view of the failure of the barge lines to establish a basis under § 15a(3) for holding up the rates and eliminating the differential between them, the command of that section re-

quires the conclusion that the rail carriers' rate "shall not be held up to a particular level to protect the traffic" of the barge lines.

Accordingly we will enter an order permanently enjoining the operation, enforcement and execution of the orders of the Commission dated May 31 and September 25, 1961. The parties will submit an appropriate form of order.