203 F.Supp. 629 (1962)
MISSOURI PACIFIC RAILROAD COMPANY et al., Plaintiffs,
v.
UNITED STATES of America, and Interstate Commerce Commission, Defendants,
Machinery Haulers Association et al., Intervenors.
No. 61C 380(1).
United States District Court E. D. Missouri, E. D.
March 19, 1962.
*630 *631 Toll R. Ware, St. Louis, Mo., John C. Danielson, Chicago, Ill., John E. McCullough, St. Louis, Mo., Don McDevitt, Chicago, Ill., R. H. Stahlheber, St. Louis, Mo., for Missouri Pac. R. Co., et al.
D. Jeff. Lance, U. S. Atty., St. Louis, Mo., Robert W. Ginnane, General Counsel, I.C.C., Washington, D. C., for the United States and Interstate Commerce Commission.
LaTourette & Rebman, St. Louis Mo., and Charles W. Singer, Chicago, Ill., for Machinery Haulers Ass'n and Individual Motor Carriers (named in appendix) Intervenors.
Before MATTHES, Circuit Judge, and HARPER and DAVIES, District Judges.
HARPER, Chief Judge.
This action was brought by the Missouri Pacific Railroad Company and twenty other railroads as plaintiffs to enjoin and set aside an order of the Interstate Commerce Commission (hereinafter referred to as ICC or the Commission), Exceptions Ratings on Agricultural, Roadmaking, and Other Articles, 315 ICC 9 (Oct. 24, 1961), which determined that the railroads' reduced rates were not shown to be just and reasonable and had precipitated a rate war, and, therefore, ordered their cancellation.
This court has jurisdiction of the subject matter of this action, 28 U.S.C.A. § 1336, and the case was heard by a court composed of three judges pursuant to Sections 2321-2325, 28 U.S.C.A.
Rail management, long concerned with its apparent declining participation in the transportation of agricultural implements and road-making equipment, initiated a study and analysis of the problem which resulted in the publication and filing with the ICC of differing rail rate scales with differing minimum weights, which, it was hoped, would reflect the long recognized inherent advantage of rails  heavier loading coupled with generally reduced rates. See Magazines, Oleomargarine and Rubber from Central to East Points, 294 ICC 363, 366 (1955); Unfinished Piece Goods From Within the South, 292 ICC 772, 776 (1954). The Commission, after considering petitions of various truckers opposing the rates, and the Railroads' reply decided not to suspend the rates, as it is empowered to do by 49 U.S.C.A. § 15(7), and they thereby became effective in part on February 10, 1960, and in part on April 10, 1960. However, an investigation was begun by the ICC and resulted in its order of cancellation, the subject of this court review.
The scope of judicial review of such an order is delineated in 5 U.S.C.A. § 1009, reading in relevant part as follows:
"(e) So far as necessary to decision and where presented the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of any agency action. It shall * * * (B) hold unlawful and set aside agency action, findings, and conclusions found to be (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; * * * (5) unsupported by substantial evidence in any case subject to the requirements of sections 1006 and 1007 of this title or otherwise reviewed on the record of any agency hearing provided by statute * * *. In making the foregoing determinations the court shall review *632 the whole record. * * *" (Emphasis added.)
Courts heeding this language have applied it rather consistently, and elaborated upon it in some instances, stating that the ICC alone is to weigh the evidence, and that a court must sustain the Commission if its findings are supported by "substantial evidence", or if there is found to be a "rational basis" for the ICC conclusions, and its rulings and decisions are found to be in accord with the applicable law. Yourga v. United States, D.C., 191 F.Supp. 373, 375; State Corporation Commission of Kansas v. United States, D.C., 184 F.Supp. 691, 696. The latter case stated, l. c. 696:
"Administrative orders entered by the Commission in the exercise of its power are not to be overturned on judicial review unless they exceed constitutional limits, are based upon a mistake of law, are made without a hearing, are unsupported by the evidence, or for some other reason amount to an abuse of power." (Emphasis added.)
While the Commission is not required to make a detailed finding of facts as required of a trial court, Chicago & E. I. R. Co. v. United States, D.C., 107 F.Supp. 118, "it is not relieved of the duty to make basic or quasi-jurisdictional findings essential to the validity of the order." Chicago & E. I. R. Co., supra, l. c. 124. Here, as in the case just cited, we are left in considerable doubt as to the precise basis for the cancellation of the rates. Surely, as stated in the Chicago & E. I. R. Co. case: "It is true that something more than the ultimate finding that the carrier has failed to sustain the burden of proof is necessary * * *." (L. c. 125.) It is important to determine precisely the basis of the ICC's decision, as this court is bound thereby. As stated in Securities & Exchange Commission v. Chenery Corporation, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626: "The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." (L. c. 87, 63 S.Ct. l. c. 459.)
And again, l. c. 95, 63 S.Ct. l. c. 462, it is emphatically stated: "We merely hold that an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained." What then are the precise findings and conclusions of the Commission? They appear to be as follows:
(1) Interpretation of the low cost mode of transportation is impossible on this record, and the decision rests on other grounds;
(2) The rail rates are compensatory, and generally exceed full costs;
(3) The decrease in railway traffic is chiefly due to decreased production of the articles in question, and in no serious part to diversion of the traffic to truckers;
(4) "Since the assailed adjustments became effective, the protestants have lost a large volume of this traffic formerly transported by them * * *"; and "a substantial number of the protestants have been experiencing operating ratios which endanger their ability to continue in operation."
On these findings the Commission concluded:
"It is thus clear, from the circumstances here presented, that the establishment by the respondent of these rates has precipitated a destructive rate war which runs counter to the provisions of Section 1(5) of the Interstate Commerce Act * * *." 315 ICC, l. c. 18. The Commission then found that the ratings in issue were not shown to be just and reasonable.
It is the conclusion of this court that the Commission has based its decision in the order reviewed, in major part, if not solely, upon a finding and conclusion that the rates were unfair and unreasonable because they amounted to destructive competition injurious to various trucking companies. The Commission's reliance in its order upon Commodities  Pan Atlantic S. S. Corp., 313 *633 ICC 23, the effect of which has since been negated by the opinion in New York, New Haven & Hartford R. R. Co., et al. v. United States, 199 F.Supp. 635 (D.C.Conn.1961) (hereinafter called Pan Atlantic case), necessitated assertion of numerous other possible grounds for sustaining the order, in its argument before this court. But, we are bound by the basis of the order as originally promulgated, Securities & Exchange Commission v. Chenery, Corp., supra, and examine it in that light.
We have concluded that the decision based on the stated findings is erroneous and reflects a misinterpretation of the law as amended by Section 15a(3). Protestant truckers contend that the rates are unjust and unreasonable and their establishment constitutes an unfair competitive practice in contravention of the National Transportation Policy, 49 U.S. C.A. note preceding § 1. Respondent railroads argue that the rates are lawful under Section 15a(3) irrespective of their effect on the truckers. The latter view gains support from the legislation itself, its history, and its application in the recent Pan Atlantic case.
As far back as 1945, in the case of New Automobiles in Interstate Commerce, 259 ICC 475, the Commission had said, l. c. 538:
"As Congress enacted separately stated ratemaking rules for each transport agency, it obviously intended that the rates of each such agency should be determined by us in each case according to the facts and circumstances attending the movement of the traffic by that agency. In other words, there appears to be no warrant for believing that rail rates, for example, should be held up to a particular level to preserve a motor-rate structure, or vice versa." (Emphasis added.)
In spite of these words, the Commission had, in a line of cases through the early 1950's, often canceled reduced rates, though they were fully compensatory. While the Commission has traditionally contended that such cancellations were not ordered to protect other modes, the Congress felt otherwise, and enacted Section 15a(3) at least in part as a direction to the Commission to treat competitive rate cases in a manner consistent with the language and spirit of New Automobiles. Thus, in H.R. 1922, l. c. 15, it is said:
"The Committee feels, accordingly, that an amendment to the rule of ratemaking is desirable to serve as a guide to the Commission in achieving consistency in its treatment of competitive rate cases."
And S.Rep. No. 1678, states, l. c. 3:
"The subcommittee wishes to affirm the interpretation of the Commission given in the Automobile case epitomized in the words quoted above. The subcommittee therefore believes it necessary to amend the act only so as, in effect, to admonish the Commission to be consistent in following the policy enunciated in the Automobile case, thus assuring reasonable freedom in the making of competitive rates * * *."
The resulting amendment was explicit in its prohibition of the "protective" practices which the Congress attributed to the ICC during the 50's. It read:
"(3) In a proceeding involving competition between carriers of different modes of transportation subject to this chapter and chapters 8, 12, 13 and 19 of this title, the Commission, in determining whether a rate is lower than a reasonable minimum rate, shall consider the facts and circumstances attending the movement of the traffic by the carrier or carriers to which the rate is applicable. Rates of a carrier shall not be held up to a particular level to protect the traffic of any other mode of transportation, giving due consideration to the objectives of the national transportation policy * * *." (Emphasis added.)
Legislative history so clearly affirms the patent meaning of these words that it does not merit quotation.
*634 Yet, despite this amendment and its history, the Commission would drain its strength and negate its effect entirely by grasping the qualifications of "giving due consideration to the objectives of the national transportation policy", and emphasizing it to the detriment of the directive it merely qualifies. More specifically, that portion of the national transportation policy upon which the ICC relies, states:
"* * * to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices * * *." (Emphasis added.)
Unfortunately, the definition of "destructive competitive practices" does not appear in the national transportation policy, the act itself, or the recent amendment. Turning to judicial interpretation for guidance, in the absence of any from Congress, the Pan Atlantic case, supra, immediately presents itself. This case is of crucial, and we feel, controlling importance. There, as here, the Commission while paying lip service to the prohibition of Section 15a(3), sought to subvert it by calling the rates "destructively competitive" and hence unlawful under the "qualification" to 15a (3) and that portion of the national transportation policy having reference to "destructive competitive practices". However, in setting aside the Commission's order requiring cancellation of rail rates, the District Court had this to say about destructive competition, 199 F. Supp. l. c. 641:
"Apparently the Commission thought that any rate-competition which threatens the continued existence of a competitor it had power to prevent as a `destructive competitive practice,' irrespective of whether the challenged rates were compensatory to the proponent thereof or whether the mode of the contesting competitor was a lower-cost mode than that of the proponent. This, we hold, was an erroneous interpretation of the Act, as amended." (Emphasis added.)
Further, at l. c. 642, the court said:
"We think that Congress in adopting the 1958 amendment, which its committees thought would encourage competition, did not intend the included prohibition of compulsory rate differentials to be nullified merely because of the adverse effect of rate competition on another mode of transportation even if carried to the point of rendering one mode of transportation obsolete and hence unable to survive. Instead, we think, the differential prohibition was intended to be qualified only when factors other than the normal incidents of fair competition intervened, such as a practice which would destroy a competing mode of transportation by setting rates so low as to be hurtful to the proponent as well as his competitor or so low as to deprive the competitor of the `inherent advantage' of being the low-cost carrier." (Emphasis added.)
We are in agreement with the Connecticut court's interpretation of "destructive competition". Application of the test utilized there to the instant case indicates an absence of the "destructive competition" which the truckers urge the establishment of the questioned rates has "precipitated". Competition is destructive and unlawful under the Pan Atlantic definition only when (1) rates are so low as to harm the proponent thereof, or, (2) so low as to deprive the competitor of his advantage of being the low cost mode. It is clear from the record in this case that the rates will not be harmful to the proponent railroads. Recall the ICC's findings that the rates are "compensatory, and in most instances probably exceed full cost." 315 ICC, l. c. 18. Further, it cannot be contended that the rates deprived the truckers of an inherent advantage of being low cost mode, *635 because as indicated in the Commission's findings, 315 ICC, l. c. 16, the evidence "does not permit a determination on this record of the low cost mode on this traffic * * *."
But, the Commission argues that this lack of evidence is chargeable to the railroads' failure to carry the burden of proof under Section 15(7), Title 49 U.S.C.A. On the contrary, the railroads have sustained their burden of proving that they will receive compensatory revenues from the rates, and the following language from the Pan Atlantic case is applicable and dispositive of the Commission's argument on this point, 199 F.Supp. l. c. 646:
"But where, as here, a rate-change is protested because of its effect upon a competing mode by one who claims to have the inherent advantage of lower costs, it is for the protestant to show its cost."
Here the trucker-protestants, claiming detrimental effects of railroad rates on their business, need to show not only the proposed or actual harm to their income, but that they deserve protection by virtue of their being the low cost mode. This they did not do.
It is then the opinion of this court that the railroad rates were just and reasonable, and that under the prevailing definition of "destructive competition" in the Pan Atlantic case, supra, the rates should not have been canceled as being "destructive" or as precipitating a destructive rate war.
Other considerations lend strength to this holding. The general rule is that all relevant factors of the NTP must at least be considered by the ICC in proceedings involving the reasonableness of rail rates. Cantlay & Tanzola v. United States, D.C., 115 F.Supp. 72, 79, l. c. 81. The Commission has considered the NTP's prohibition of "destructive competitive practices" to the exclusion of all else, but other elements of the NTP dictate the preservation and not the cancellation of the rates. For example, it states:
"It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act * * * so administered as to recognize and preserve the inherent advantages of each * * *." (Emphasis added.)
Preservation of inherent advantage is thus recognized by the NTP. It has also been recognized by the Supreme Court in Schaffer Transportation Co. v. United States, 355 U.S. 83, l. c. 91, 78 S.Ct. 173, l. c. 178, 2 L.Ed.2d 117, where it was said:
"The ability of one mode of transportation to operate with a rate lower than competing types of transportation is precisely the sort of `inherent advantage' that the congressional policy requires the Commission to recognize."
It is the rails' inherent advantage of being able to haul increasingly heavy loads at reduced rates which is being asserted in the instant rates. It is evident that in the demonstrated absence of any destructive competition, there are no grounds for precluding such assertion. Cancellation of the proposed rates would hinder competition fostered by Section 15a(3) and destroy, not preserve, inherent advantage.
The government in the Pan Atlantic case insisted that a rate war was the inevitable consequence of allowing the rate reduction. A similar argument is made to this court, but as explained in the Pan Atlantic case, the Commission under its power to fix minimum rates, 49 U.S.C.A. § 15(1), can disapprove rates not compensatory and thus prevent rate wars or destructive competition. This power has been judicially recognized in Anchor Coal Co. v. United States, D.C., 25 F.2d 462, l. c. 471-72, reversed per curiam, 279 U.S. 812, 49 S.Ct. 262, 73 L.Ed. 971, but without detriment to the proposition for which it is herein cited.
*636 The Commission has advanced arguments in support of cancellation which if sustained would render the passage of 15a(3) nugatory, and which manifest a misinterpretation of the law as we understand it.
The order of the Interstate Commerce Commission dated October 24, 1961, in Proceedings No. 33334, reported at 315 ICC 9, shall be set aside and its enforcement enjoined. A decree in accordance with this opinion may be submitted by the plaintiffs on notice unless consultation amongst the parties shall bring about a waiver of notice.