**ST. LOUIS–SAN FRANCISCO RAILWAY COMPANY et al., Plaintiffs,**

v.

**The UNITED STATES of America, and The Interstate Commerce Commission, Defendants,**

**Southern Motor Carriers Rate Conference, Inc., et al., Intervenors.**

**Civ. A. No. 61 C 309(1).**

United States District Court
E. D. Missouri, E. D.
July 5, 1962.

**294**

John E. McCullough and Ernest D. Grinnell, Jr., St. Louis, Mo. (Toll Ware, St. Louis, Mo., A. J. Dixon, Washington, D. C., Wm. E. Davis, Kansas City, Mo., Donald Turkal, Richmond, Va., Albert Russ, Jacksonville, Fla., Eugene S. Davis, and John L. Davidson, Jr., St. Louis, Mo., for plaintiffs.

Robert Kennedy, Atty. Gen. of the United States, Washington, D. C., D. Jeff. Lance, U. S. Atty., St. Louis, Mo., Lee Loevinger, Asst. Atty. Gen., Dept. of Justice, Richard A. Soloman, Atty., Dept of Justice, Archibald Cox, Solicitor Gen. of the United States, Dept. of Justice, Robert W. Ginnane, Gen. Counsel, Interstate Commerce Commission, B. Franklin Taylor, Jr., Assoc. Gen. Counsel, Interstate Commerce Commission, Washington, D. C., for defendants.

Ariel V. Conlin, Crimm & Postell, Atlanta, Ga., Resident Counsel, LaTourette & Rebman, St. Louis, Mo., for intervenors.

Before MATTHES, Circuit Judge, and HARPER and MICKELSON, District Judges.

MATTHES, Circuit Judge.

This action was brought under 28 U.S.C.A. §§ 1336, 2284, and 2321–2325 by the St. Louis-San Francisco Railway Company and six other railroads as plaintiffs (hereinafter referred to collectively as "Railroads") to set aside and enjoin a rate order of the Interstate Commerce Commission (hereinafter referred to as the ICC or "Commission"), dated May 5, 1961, reported as Cigars from Jacksonville to Kansas City, 313 I.C.C. 633. Upon order of court, the Southern Motor Carriers Rate Conference, Inc., and three motor carriers were allowed to intervene in support of the Commission's order. Pursuant to §§ 2321–2325, 28 U.S.C.A., the matter was heard before a three-judge court.

The rates involved in the Commission's order cover shipments of cigars from Jacksonville, Florida, to Kansas City, Missouri-Kansas. Prior to April 4, 1960, the railroad rate was $2.88 cwt., minimum 24,000 pounds, and the motor carrier rate was $2.87 cwt., minimum 22,000 pounds. Effective April 4, the railroads reduced their rate to $2.26 cwt., minimum 22,000 pounds, and on April 13, 1960, the motor carriers followed with a reduction of their rate to $2.46 cwt., minimum 24,000 pounds. The motor carriers protested the new rail rate, asking that it be suspended, and that if suspended, the new motor rate likewise be suspended. The ICC, while not suspending the new rates, undertook an investigation, and a hearing was had before an examiner, who subsequently filed his report, recommending cancellation of the new rates and substitution of other rates. Upon exceptions filed by the railroads, the ICC, Division No. 2, reviewed the examiner's report, and filed its report, essentially following the recommendations of the hearing examiner. Although the findings of the Commission will be discussed in greater detail at a later point, the ICC order, ruling the proposed rates not to be "just and reasonable," in effect, sets future rates on this transportation at $2.87 for the motor carriers and $2.63 for the railroads, both, minimum 24,000 pounds. After the instant suit was filed, the ICC entered its order staying its decision of May 5, 1961, cancelling the proposed rates, so that to the date of this opinion, the new rates have continued in effect.

Under § 1009(e), 5 U.S.C.A., the scope of our review of the Commission's order is limited to a determination, *upon*

*the whole record* of whether the Commission's findings are supported by substantial evidence, or whether its findings and conclusions were induced by misapplication of the law. In other words, if the Commission's findings are supported by substantial evidence and are in accordance with the law, they must be upheld. See Universal Camera Corporation v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L. Ed. 456; Yourga v. United States, D.C. Pa., 191 F.Supp. 373, 375, 376; State Corporation Comm. of Kansas v. United States, D.C.Kan., 184 F.Supp. 691, 696; Missouri Pacific Railroad Co. v. United States, D.C.Mo., 203 F.Supp. 629. Plaintiffs attack the order of the ICC upon two grounds, a) that the findings are not supported by substantial evidence, and b) that the Commission misconstrued, misapplied, and/or ignored the dictates of § 15a(3) of the Interstate Commerce Act, 49 U.S.C.A. § 15a(3).

The commerce involved consists of the shipment of approximately one carload of cigars per month of the average value of $36,763.50 from one shipper at Jacksonville (with a rail siding) to one consignee at Kansas City, who has no rail siding. The shipper pays the freight charges. During the past 7½ years, under the old rail rate of $2.88 cwt., the railroads obtained none of the traffic.[1] The old motor carrier rate of $2.87 cwt. included pickup and delivery, or door-to-door service, while on rail movements, the shipper was required to load the rail cars at a cost of $10 per car or approximately 4 cents per cwt., and to furnish unloading and delivery service to the consignee in Kansas City which entailed an additional 20 cent per cwt. expense apart from the rail freight. The Commission found that when the rates are approximately equal the traffic tends to move via motor carrier, and that although motor service was used in the past because of faster service, the controlling element was the rate. A witness for the shipper testified before the hearing examiner that if the new rates remained in effect ($2.26 rail, $2.46 motor) the shipper would plan on dividing the shipments about equally between the two modes of travel.

Although the Commission failed to make specific findings so holding, implicit in its report is the conclusion that the new rates of both carriers are compensatory, and such a conclusion is substantiated by various exhibits filed herein. In this connection, we find the following statement in intervenors' brief:

"* * * they (motor carriers) are prepared to reduce their rates to remain competitive with the railroads and as demonstrated by their cost evidence, can readily do so.

"The motor carriers have already reduced their rate to meet the new reduced rail rate *and such reduced motor carrier rate has been found to be compensatory.*" (Emphasis supplied.)

The Commission found that estimated "out of pocket" costs of the railroad were $1.1685 per cwt., with "fully distributed costs" at $1.4606. Costs of the motor carriers were figured on the basis of truckload minimum revenues, and as to three alternate routes involved, the Commission found that on the new basis of $2.46 cwt. "out of pocket" costs would account for 92.6%, 65% and 67.9% of the revenue, while "fully distributed" motor costs (including allowances for overhead and return trip of the truck) would be in the ratios of 102.9%, 72.2%, and 75.-5% of the revenue.

While defendants and intervenors attack the probative value of the railroads' cost data, we note that the Commission ruled: "Although the record is not entirely clear, in our opinion the rail carriers appear to be the low-cost form of transportation."

The Commission, however, concluded that "[e]ven though rates are compensatory, they are not necessarily just and reasonable," (citing Tobacco from North Carolina to Central Territory, 309 ICC

---

1. After publication of the new rate, and at the time of the hearing, the railroad had moved one shipment of cigars.

347), and cancelled the new rates of both carriers and found that "for the future a just and reasonable motor carrier rate will be 55 percent of the corresponding first-class rate, minimum 24,000 pounds" [$5.22], which would be the old motor rate of $2.87, and that a "just and reasonable rail rate will be the said class 55 rate less not more than 24 cents, minimum 24,000 pounds." This would in effect set the rail rate at $2.63, 24 cents under the motor rate.[2]

Before proceeding to a discussion of the validity of the Commission's findings, we look to the statutory scheme which has been set up by Congress to guide the Commission in establishing rates in interstate commerce.

Section 1, par. (5) of the Interstate Commerce Act, 49 U.S.C.A. states that "[a]ll charges made for any service rendered * * * in the transportation of passengers or property * * * shall be just and reasonable * * *." By § 15 of the Act, the Commission is empowered to determine and prescribe rates, and § 15a, entitled "Fair return for carriers," provides:

"(2) In the exercise of its power to prescribe just and reasonable rates the Commission shall give due consideration, among other factors, to the effect of rates on the movement of traffic by the carrier or carriers for which the rates are prescribed; to the need, in the public interest, of adequate and efficient railway transportation service at the lowest cost consistent with the furnishing of such service; and to the need of revenues sufficient to enable the carriers, under honest, economical, and efficient management to provide such service.

"(3) In a proceeding involving competition between carriers of different modes of transportation subject to this chapter * * * the Commission, in determining whether a rate is lower than a reasonable minimum rate, shall consider the facts and circumstances attending the movement of the traffic by the carrier or carriers to which the rate is applicable. *Rates of a carrier shall not be held up to a particular level to protect the traffic of any other mode of transportation, giving due consideration to the objectives of the national transportation policy declared in this chapter and chapters 8, 12, 13 and 19 of this title.*" (Paragraph 3 added by 1958 Amendment, Pub.L. 85–625.) [Emphasis supplied.]

The "national transportation policy" referred to in subparagraph 3, above, the Act of September 18, 1940, 54 Stat. 899, amended the Interstate Commerce Act by inserting the following provision:

"It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices * * * all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. * * * *"

---

2. The Commission found that the rail rate should be differentially lower than the motor rate to offset added cost of loading and unloading incidental to use of rail, setting this differential at 24 cents. The hearing examiner had set the differential at 20 cents.

Plaintiffs urge that the Commission's order is unlawful and contrary to the positive provisions of § 15a(3) above quoted, in that it holds up the rail rate at a specific level in relationship to the motor carrier rate for the purpose of protecting the traffic of the latter, and that the Commission further erred in basing its decision upon policy factors of the national transportation policy which were entirely unsupported by the evidence. The defendants and intervenors take the position that the rates imposed by the Commission are fair and just in light of the commodity carried; that the Commission lawfully acted to protect the revenues of the carriers involved by preventing destructive price competition; and they further point out that plaintiffs should have no cause for complaint since, under the Commission's order, the railroads will enjoy a 24 cent differential in rates, as opposed to a 20 cent differential if the new rates had been approved.

From our considered examination of the Commission's report, which we do not regard as a model for clarity, we are satisfied that the Commission concluded that it was necessary to tie the rail rates to the motor carrier rates in order to foster "sound economic conditions * * among the several carriers," and apparently it failed to give any concern to the prohibition contained in § 15a(3) of the Act, that rates of a carrier "shall not be held up to a particular level to protect the traffic of any other mode of transportation, * * *," at least no reference to such prohibition appears in its report and decision.

■ To what extent is the prohibition found in § 15a(3) qualified by the provisions of the national transportation policy? We do not believe it necessary to again review the legislative history of the 1958 amendment which added paragraph (3) to § 15a of the Act—this history was thoroughly reviewed in New York, New Haven & Hartford R. Co. v. United States, D.C.Conn., 199 F.Supp. 635, appeal docketed in Supreme Court, and more recently by the court in Missouri

Pacific Railroad Co. v. United States, supra, D.C.Mo., 203 F.Supp. 629. It is sufficient to say that Congress made it very clear that the purpose of the amendment was "to provide freer play for competition as between different modes (of transportation) while still continuing protection to the modes having the inherent advantage of low cost from unfair or destructive competitive practices." New York, New Haven & Hartford R. Co. v. United States, supra, 199 F.Supp. at p. 642. We are in full agreement with the well-reasoned conclusion of the court in the New Haven case that the prohibition against artificial differentials may not be nullified merely because it will have an adverse effect on the traffic of a competing carrier, and that the "inherent advantage" factor and the "destructive competitive practice" factor of the national transportation policy are the only two factors which may justify an artificial differential in rates. To sustain the findings of the Commission here, there must be evidence substantiating the presence of "unfair or destructive" competitive practices, or evidence to support the conclusion that the rates established by the Commission were necessary to protect some inherent advantage of a particular mode of transportation. On the whole record, we find no substantial evidence to support either of these conclusions.

In the first instance, there can be no question of preserving the inherent advantage of a particular mode of transportation. The Supreme Court ruled in Schaffer Transp. Co. v. United States, 355 U.S. 83, 78 S.Ct. 173, 2 L.Ed.2d 117, that a "low-cost factor" is one of the inherent advantages within the protection of the national transportation policy, but as we have seen, the Commission found the fact to be that the *railroads* are the "low cost mode" in the circumstances under investigation here.

■ Secondly, defendants and intervenors urge that the Commission cannot be said to have acted to protect the motor carriers' traffic, inasmuch as "they needed no protection." As we have seen, by

giving a 24 cent differential adjustment to offset extra rail costs, the Commission in effect made the two rates equal, with nothing to choose between them cost-wise. Apparently, this seemed to the Commission an equitable apportionment of the traffic, and defendants and intervenors seem unable to understand why plaintiffs should not be happy with half when before they had none. Be that as it may, it is clear that the Commission's order effectively cancels any cost competition between the two modes, and protects the traffic of the motor carriers to the extent that they are reasonably assured of not losing their "equitable share" of one-half. It seems abundantly clear that upon posting new rates, the railroads were not seeking one-half the traffic, nor were they seeking any particular differential, 20 cents or 24 cents below the motor rate. They issued a rate of $2.26 per cwt., and sought to justify it as fair and reasonable through evidence that such rate was more than compensatory. It may well be that, as the "low-cost" mode, the railroad can afford to lower its rates to such an extent that the motor carriers may find themselves priced out of this particular competitive market, but we do not understand that that factor alone may justify a qualification of the prohibition found in § 15a(3), absent of course wrongful and unlawful cutting of rates below reasonable returns. See and compare Report of Commission, "Exceptions, Ratings on Agricultural, Road Making, and Other Articles," No. 33334, —— I.C.C. ——, enforcement of order enjoined, Missouri Pacific Railroad Co. v. United States, supra, D.C.Mo., 203 F.Supp. 629.

◼ Since the rates involved were found to be compensatory, there is no evidence to support a conclusion of "unfair or destructive competitive practices," as such.

◼ In the interest of fostering sound economic conditions within the industry, we feel, as did the court in the New Haven case, supra, 199 F.Supp., beginning at p. 642, that the Commission in fact relied upon the so-called "value of service" theory in setting the rates at issue. In essence, this theory is used to subsidize certain non-profitable commodities, whereby high-value commodities are made to bear more than their share of costs in order to offset deficiencies attributable to other commodities. We need not consider whether or not application of this theory may qualify the prohibition of § 15a(3), since we must rule there is no substantial cost evidence, or indeed *any* evidence, to warrant a finding of a compelling need of artificially high rates on tobacco in order to enable the carriers to stabilize their overall rate structure. Certainly there is no evidence that the motor carriers were dependent upon high returns on the commodity in question in order to stabilize an over-all low cost rate structure. See New York, New Haven & Hartford R. Co. v. United States, supra, 199 F.Supp. at pp. 644–645.

The issues before us have involved a rather unusual factual situation since we have the anomoly of the cancellation of low rates which are compensatory, and substitution of higher rates, seemingly equitably set so as to afford both modes an equal share of the traffic. Apparently, the only "evidence" to justify the Commission's conclusion that the old motor rate of $2.87 is "just and reasonable" is the fact that the commodity had moved at that rate. Here we observe that while the shipper had been paying that rate, it obviously had no real choice in the matter, because it would appear there were only two modes of traffic available, rail and motor carrier. We cannot escape the conclusion that the ultimate finding that the rates in issue are not just and reasonable was motivated by the erroneous concept that it was necessary to establish an "equitable rate" so that each mode could share the traffic on equal footing. Nowhere in the report do we find discussion of the factors set out in paragraph (2) of § 15a which are to guide the Commission in establishing just and reasonable rates—i. e., the effect of new rates on the movement of traffic by the carrier which proposes them; or, to the need, in the public in-

terest of adequate and efficient railway transportation service at the lowest cost consistent with the furnishing of such service. While in the eyes of the Commission, the defendants, and the intervenors, the rates seem most equitable and fair to all, the practical effect of the Commission's order is to stifle competition, rather than to encourage fair competition among the carriers, in derogation of the terms of the 1958 amendment, paragraph (3), § 15a(3), 49 U.S.C.A.

The order of the Interstate Commerce Commission dated May 5, 1961, reported in 313 I.C.C. 633, is hereby set aside and annulled, and its enforcement is enjoined.

A decree in accordance with this opinion may be submitted by the plaintiffs on notice unless consultation among the parties shall bring about a waiver of notice.

