**RAILROAD COMMISSION of Texas,**
**Appellant,**

v.

**OIL FIELD HAULERS ASSOCIATION,**
**Inc., et al., Appellees.**

No. 11102.

Court of Civil Appeals of Texas.

Austin.

May 29, 1963.

On Motion for Stay June 5, 1963.

On Motion for Rehearing June 19, 1963.

Rehearing Denied July 10, 1963.

Waggoner Carr, Atty. Gen., Norman V. Suarez, Asst. Atty. Gen., Austin, Ralph W. Currie, Sp. Asst. Atty. Gen., Dallas, for appellant.

Clark, Thomas, Harris, Denius & Winters, James H Keahey and Wallace McLean, Austin; Joe G. Fender, Houston; Callaway, Reed, Kidwell & Brooks, Dallas, for appellees.

HUGHES, Justice.

This appeal is from an order granting a temporary injunction enjoining enforcement of an order of the Railroad Commission of Texas reducing railroad transportation intrastate rates on carload shipments of wrought iron, cast iron[1] and steel pipe or tubing.

The above order was made by the Commission upon complaint filed with it by Lone Star Steel Company against then existing rates on wrought iron and steel pipe or tubing in carloads by railroad between points in Texas. Lone Star intervened in the Trial Court and aligned itself with the Commission; it, however, did not join the Commission in appealing from the injunctive order.

The suit below was filed by the Oil Field Haulers Association, Inc., the purpose of

1. The Commission contends that the order, properly construed, does not include cast iron pipe.

which was to have the order of the Commission set aside and to enjoin its enforcement. A plea in intervention was filed by Hill and Hill Truck Line, Inc., seeking the same relief. A similar plea in intervention was filed by Chicago Rock Island and Pacific Railroad Company, Gulf Colorado and Santa Fe Railway Company, Missouri Pacific Railroad Company, Panhandle and Santa Fe Railway Company, The Pecos Valley Southern Railway Company, St. Louis, San Francisco and Texas Railway Company and The Texas and Pacific Railway Company.

The Oil Field Haulers Association, Inc., in a sworn pleading alleged that it was a trade association composed of many members of the oil field motor carrier industry, which members hold and operate under specialized motor carrier certificates of convenience and necessity issued to them by the Railroad Commission; that these certificates authorize them to transport for hire by motor vehicle, over irregular routes within Texas, oil field equipment and materials, that they are presently engaged in such activities and have expended huge sums of money therein. It was particularly alleged that, "In the conduct of their operations, plaintiff's members are in direct competition with the railroads in this State. Such competition is particularly vigorous in the transportation of pipe or tubing, iron or steel."

The order of the Commission was attacked by Haulers on these grounds:

1. It purports to amend a tariff, Railroad Commission Tariff No. 322, which is no longer in effect, and hence it is "illegal and void as a matter of law."

2. There is no evidence that present rail pipe rates have become "unreasonable, unfair or excessive," and that the reductions ordered by the Commission are "wholly unjustified and it cannot be shown that they are reasonable, fair or compensatory."

3. There is no evidence that present rail pipe rates are "unduly prejudicial of certain shippers in localities of the State and unduly preferential to other shippers in localities of the State" as found by the Commission.

4. There is no evidence that the present rail pipe rates discriminate against shipments from Lone Star by not giving that point the advantage of its geographical location.

5. The order of the Commission is arbitrary and invalid because it reduces rates on the transportation of cast iron pipe despite the recitation in the Commission notices for the hearing preceding the issuance of such order that cast iron pipe was not involved in the complaint before it by Lone Star Steel.

6. The Commission based its order on an Interstate Commerce Commission tariff which has no relation to what is fair or compensatory for transportation intrastate rates in Texas.

7. The Order of December 18, 1962, "would impose rail pipe rates which would be discriminatory against plaintiff [Haulers] and its members. If put into effect, it will cut the rail rates on pipe to such an extent that the oil field carriers will no longer be competitive. As a result, plaintiff [Haulers] and its members will not participate in the transportation of pipe between any two points in Texas which can be served by railroad. And not only will the Order of December 18, 1962, have the effect of diverting intrastate shipments of pipe to the rail carriers, but it will also divert interstate exbarge traffic to intrastate rail routes. The long-haul transportation of pipe is a main source of revenue to plaintiff [Haulers] and its members, and the Railroad Commission erred in ignoring the disastrous effect that its Order of December 18, 1962, will have on the oil field carriers of this State."

8. The order of the Commission "totally ignores the basic elements of transportation economics." The essence of this objection is that the Commission used erroneous data in determining the rate prescribed and that it failed to take into account the principles

of "classification of freight, the theory of volume rates, and the theory of declining costs" in considering the rate it fixed.

We now copy from the concluding paragraph in Haulers' petition:

"The Defendant Commission in prescribing the rates complained of through the issuance of its December 18, 1962, Order has reduced the rates on pipe or tubing, iron or steel, without any testimony or evidence of record upon which to predicate a finding that the rates now in existence are discriminatory, unjust, or unreasonable. All the evidence before the Commission was and is to the contrary. The action of the Commission in its Order of December 18, 1962, was taken without substantial evidence or any evidence to support its action and constitutes an abuse of discretion on its part, and is unlawful. As a result of such arbitrary, unreasonable, and capricious action by the Commission, plaintiff and its members will no longer be able to compete with the intrastate railroads for the long-haul movement of pipe, which traffic now constitutes a main source of income for plaintiff's members. The Commission's Order will result in monetary loss and damages to plaintiff and its members that are incapable of determination."

Intervenor, Hill and Hill Truck Line, Inc., by sworn pleading, alleged its anticipated loss in revenues as a result of the Commission Order in question and further alleged that the rates therein prescribed for railway transportation were "below the cost of handling in truck service and, by reason thereof, intervenor cannot lower its intrastate rates to the level prescribed by the Commission," and that, "By reason of the foregoing * * * the rates prescribed by the Railroad Commission are unjust, unreasonable and confiscatory * * *"

The railroad intervenors, above named, pleaded, by an unsworn petition, that if the rates set by the Commission remain in force that their revenues on the shipments affected would be reduced by more than 25%. They also allege that they will suffer losses from their interstate business as well. The railroads plead that the rates prescribed by the Commission for pipe are the same as those applying on iron and steel articles, other than pipe, moving interstate which rates, they allege "were brought about and forced into being by competitive conditions and circumstances that are not applicable in connection with shipments of pipe intrastate in Texas."

We quote the final paragraph of the railroad's petition:

"The prescribed rates on pipe are so low they will unnecessarily and unwarrantably dissipate the revenues of the Railroads and therefore are unjust and unreasonable, in violation of the statutes of the State of Texas. This is particularly so as the Railroads do not now earn an adequate return on their investment in property devoted to public service."

The response of the Commission to the pleadings of Haulers was that it was not a party at interest under Art. 6453, Vernon's Ann.Civ.St., and, hence, had no right to bring this suit,[2] and that its pleadings failed to show that the order of the Commission was unjust and unreasonable to it.

The Trial Court heard the case upon the sworn pleadings and affidavits only. The Trial Court made no findings of fact other than those contained in its order granting the temporary injunction, which we quote:

"The Court is of the opinion that Plaintiffs are entitled to the temporary injunction as herein granted, same being within their allegations and prayer, for the reason that the Railroad Commission's order of December 18, 1962,

2. This objection has been eliminated by the filing of a trial amendment by adding as plaintiffs numerous individuals and corpo-

rate truckers, including intervenor Hill & Hill Truck Line, Inc.

purports to amend a tariff, Railroad Commission Tariff No. 322, which is no longer in effect; applies to cast iron pipe or tubing, when no notice or hearing was given as to such commodity; attempts to apply a reduced, volume rate statewide in Texas when, in fact, there is no support for classifying all points in Texas as volume points; attempts to reduce Texas rail pipe rates to the abnormally low level of interstate rail pipe rates which have been reduced to meet barge-truck competition; adopts a scale of rates from an interstate tariff which applies in a forty state area and does not apply to pipe, such being a wholly arbitrary way of fixing a scale of rates to apply in Texas on pipe; totally ignores basic rate making principles without justification for so doing; and ignores the effect that its order will have upon the buying public in Texas and upon the competing oil field carrier industry. If the Defendants Railroad Commission of Texas, et al., proceed to enforce the rates set out in its order of December 18, 1962, such action would deprive the Plaintiffs of the bulk of their pipe tonnage and revenue, resulting in irreparable and inestimable damage to Plaintiffs; it would also probably substantially reduce the revenue which the intervening railroad companies derive from the transportation of pipe in Texas, to their irreparable and inestimable damage. I therefore find that the Plaintiff-Intervenors have made a proper showing of a probable right and probable injury of the matters in the temporary injunction prayed for."

The Commission, in its brief, has quoted or summarized the substance of affidavits filed on behalf of Haulers and its members who are plaintiffs and, since the accuracy and completeness of such summaries and quotations are not questioned, we adopt them. Affiant Edgar P. Hardin:

" 'If the rates prescribed by the Commission in the order of December 18, 1962, become effective, the over-the-

road pipe traffic now being handled by oilfield carriers will be diverted almost entirely to the railroads. The order of December 18, 1962, cuts the rail pipe rates so greatly that oilfield carriers will be unable to compete for the transportation of pipe between points and areas in Texas served by railroads. The comparison in Exhibit A effectively illustrates this fact. In this exhibit, the present and proposed Texas intrastate rail rates are compared with the present 30,000 pound motor carrier pipe rates. As an example of severe rate cutting, note the comparison at 300 miles: At the present time the rail rates are only $3\frac{1}{2}\cent$ per Cwt. below those of the oilfield carriers; under the order of December 18, 1962, they would be 28¢ per Cwt. below the oilfield carrier rates. The oilfield carriers cannot compete under such conditions.'

Acknowledging that much of the pipe traffic moves between oilfield locations and the oilfield hauler is therefore a necessity, the affidavit then states:

'The net effect of the Commission's order will be to reduce oilfield carriers to short haul field operators insofar as pipe traffic is concerned. As a result, the oilfield carriers of Texas will be deprived of substantial portion of the revenue upon which they now depend.'

After reciting certain reports of several oilfield carriers and referring to certain exhibits on file with the Commission for the year 1961, the affidavit continued:

'As is indicated in these exhibits, the financial condition of the oilfield carrier industry is now extremely precarious; the reduction in traffic and revenue which unquestionably will result from the order of December 18, 1962, would be disastrous to this industry.'

The affidavit concludes with the following statement:

'If the order is permitted to become effective, individual oilfield carriers will

lose traffic which accounts for from approximately 10% to approximately 50% of their total revenue. Investments have been made in plant and equipment necessary to participate in over-the-road pipe traffic and this investment will be lost.' "

Affiant Chauncey White, Jr.:

"The affidavit recites in substance that his employer, T. E. Mercer Trucking Company, derives about one third of its revenue, 'from the transportation of shipments of pipe or tubing, iron or steel, between points in Texas.' The great bulk of this traffic will be lost if the order becomes effective. The loss of this traffic would require reduction in personnel. It would reduce Mercer to a short-haul carrier. This would require considerable more expense while, because of the much shorter hauls, Mercer would receive much less revenue. That even under the existing rates a number of motor carriers go out of business annually due to rising costs and strong competition from other modes of transportation. If the reduced rail rates go into effect, Mercer will have to reduce employees and equipment and there is some danger that it could not stay in business."

Affiants T. V. Woodard and Jack Gaines:

"These affidavits are on a printed form differing from each other only with respect to the identity of the affiant, the amount of equipment used, the number of people employed, pipe shipments made, their weight and the revenue. Plaintiffs' Exhibit 3, T. V. Woodard, is typical. It recites in substance that during 1962 his company transported 311 shipments of pipe or tubing, iron or steel, both in intrastate and in interstate commerce in Texas. These would be affected by the Railroad Commission's order of December 18, 1962. The shipments weighed, total, 19,772,584. His company received total revenue of $111,328.00 for this transportation. In affiant's opinion if the order becomes effective his company will become non-competitive with the railroads in this state and will lose most, if not all, of the traffic and revenue above described."

Affiant W. J. Derrick:

"(a) Revenue and cost on present intrastate rates with competitive rates which Hill & Hill Truck Line, Inc., would be forced to observe if the prescribed rates in the order under attack should become effective.

(b) The per mile operating cost of Hill & Hill. This is stated to be $.4166 (per mile)."

We add to this summary that the Exhibit attached to the affidavit of Mr. Derrick shows that the revenue of Hill and Hill from the shipments considered would be $37,341.28, whereas the competitive railway rates, if they become effective, would be $27,897.35 from the 40,000 pound minimum rate and $26,457.15 from the 80,000 pound minimum rate, prescribed by the Commission order.

Affiant H. Ormston:[3]

" * * * Hill & Hill derives about 40% of its gross revenue from the transportation of pipe between points in Texas; the preponderance of this pipe moves in interstate commerce from the port of Houston; pipe from interstate origins moves to destinations in Texas in combination barge and truck service. The truck portion of this movement constitutes a substantial part of Hill & Hill's total business. The interstate rates charged by Hill & Hill are prescribed at a minimum level by the Interstate Commerce Commission so that these rates cannot be

3. Mr. Ormston swore to the intervention of Hill and Hill Truck Line which the

Commission treats as an affidavit in behalf of Haulers petition.

adjusted downward to the level here proposed for intrastate movement. The rates prescribed by the Commission are below the cost of handling in truck service, and by reason thereof Hill & Hill cannot lower its intrastate rates to the level prescribed by the Commission. By reason of the foregoing the rates prescribed by the Commission are unjust, unreasonable and confiscatory."

The intervening railways offered four affidavits, the substance of which we take from the brief of the Commission, unchallenged in this respect:

Affiant B. V. Reynolds:

"This affidavit reveals that Texas & Pacific Railway Company for the nine months period beginning January 1, 1962, and ending September 30, 1962, received from the transportation of iron and steel pipe, freight revenue in the amount of $1,365,847.00. Exhibit A attached to this affidavit is a comparison of the new and the old rates. To judge the effect of the new rates on tonnage actually moved affiant examined movement records for the six months period beginning June 1, 1962, and ending November 30, 1962. Since most of them were destined to Odessa, Texas, Exhibit B to the affidavit was prepared showing information about those shipments. During that period the T. & P. had 65 cars which moved from Lone Star or Bond to Odessa. Only 5 of them are cars on which the lowest charge to the shipper would be on the basis of the newly prescribed 40,000 pound rate. So far as the T. & P. is concerned, the amount of revenue which it received on these intrastate movements of pipe was $26,435.32. Had the new rates been in effect the revenue would have been $19,507.81 or a reduction of $6,927.51. Based on the percentage of reduction thus shown, it is the opinion of affiant that during the six months period Texas & Pacific would suffer a reduction of $17,648.00

on intrastate pipe revenue. Affiant did not take into account any revenue losses that T. & P. might have on interstate traffic."

Affiant A. R. Kilian:

"Affiant works for Panhandle & Santa Fe Railway Company which operates entirely within the State of Texas. It does handle shipments moving in interstate commerce by virtue of its connection with other railroads. The new rates provided would reduce the revenue his company receives from the transportation of pipe when moving in intrastate commerce. During the period June through November inclusive, 1962, if the new rates had been in effect the P. & S. F. would have suffered a loss of $1,267.50 or 19% of revenue on this traffic. (Intervenors' Exhibit No. 2, page 2.) Page 3 of the Exhibit deals with railroad rate-of-return as shown by reports from the Railroad Commission to the Governor of the State of Texas. Page 4 of said exhibit asserts that 'The Railroads would receive less revenue on shipments of pipe under certain circumstances than they would on comparable shipments of iron and steel articles.' This is due to an unloading allowance which the railroads make of 7.5¢ per 100 pounds to the consignee, when the shipment originates at either Bond or Lone Star, Texas, and is delivered at Fort Stockton, McKamey, Midland, Odessa, Rankin, or Seagraves, Texas, provided such shipment weighs 70,000 pounds or more. (Intervenors' Exhibit No. 2, page 4.) Also, interstate iron and steel articles rates are not subject to classification, Rule 24, whereas the newly prescribed pipe rates are subject to such rule. (Intervenors' Exhibit No. 2, page 5.)"

Affiant S. P. Lawrence:

"Affiant is with the Missouri-Pacific. This railroad handles a large volume of interstate traffic that originates or

terminates in Texas and also a substantial volume of Texas intrastate traffic. During the six month period investigated the Missouri-Pacific handled 170 cars of pipe moving in Texas intrastate commerce, some in single-line service and others in conjunction with other railroads. The total revenue paid to the rail carriers for handling that tonnage amounted to $44,045.00. If the new rates had been in effect there would have been a reduction of $9,594.00, or 21.7%. If the new rates become effective they will materially effect Missouri-Pacific's movement of pipe in all rail service. If this line should be forced to reduce the long-haul all-rail rates in order to more effectively compete with barge traffic, the revenue loss in dollars would be greater than indicated."

Affiant J. S. McEldowney:

"Affiant is employed by the Gulf, Colorado & Santa Fe Railway Company. It handles both interstate traffic and intrastate traffic, including iron or steel pipe or tubing. During a four months period in 1962 this road terminated in excess of 1,400,000 pounds of pipe moving in Texas intrastate commerce. Santa Fe revenue for this traffic was $1,803.71. Had the traffic moved under the new rates, the G. C. & S. F. revenue would have been reduced by $718.44. The long-haul all-rail interstate rates and the tonnage handled on them are directly influenced by the level of the Texas intrastate rates. One shipper has already made formal application to reduce the interstate all-rail rates to the same level as the Commission has prescribed in this docket."

The Commission offered four counter affidavits. They came from C. R. McNamee, Rate Director for the Commission; Caroll G. Mathews, Assistant General Freight Agent for the Fort Worth and Denver Railway Company; R. W. DeLay, Assistant General Freight Agent for Kansas City Southern Lines, which include Louisiana and Arkansas Railway Company; and Cecil L. Williamson, General Traffic Manager for Lone Star Steel Company.

The pertinent substance of these affidavits is given by the Commission in its brief, as follows:

"That the rates are fully compensatory and even attractive to the railroads; that the railroads are presently receiving but little intrastate pipe traffic because the rates are too high; that the new scale is on the same basis as is the scale presently applicable in Texas on iron and steel articles other than pipe; that from a transportation standpoint there is little, if any, difference between the two and both should be on the same level; that the plaintiffs, motor carriers, are already applying the same rates which they are here attacking, in movements between Texas points in intrastate commerce, on iron or steel articles other than pipe."

The railways criticize the affidavit of Mr. Mathews, saying: "He gave no testimony about the length of his railroad, but did make the significant statement 'There is very little traffic moving by rail in carloads on pipe intrastate in Texas on the line of my railroad.' Manifestly, if the Ft. Worth and Denver is not transporting any pipe traffic it has little interest in how much the challenged order might reduce the revenue on that traffic. Stated another way, if that railroad only moves one car every six months or every year, it has little to lose from the standpoint of revenue even if it should be required to transport that single car free of charge. This is a completely different situation from that of the railroad intervenors. They are actually hauling the traffic in appreciable quantities and therefore have revenues which can be reduced in large amounts."

The railways also criticize the affidavit of Mr. DeLay and summarize this criti-

cism by saying, "We submit that one reasonable conclusion to be drawn from the testimony of Messrs. Mathews and DeLay, and possibly the only sound one, is that the Ft. Worth and Denver does not handle any of the intrastate pipe traffic, and, therefore, has little concern with the level of the rates, while for some reason the Kansas City Southern is willing to have its revenue drastically reduced so it can handle all of the Texas intrastate pipe traffic."

Upon the hearing below, the following colloquy between the Trial Judge and counsel for the railways occurred:

"THE COURT: Do you allege confiscatory effect?

"MR. BROOKS: We do not allege that the rates are confiscatory. Neither do we allege that they are non-compensatory, if there is distinction between the two.

"THE COURT: You do allege that they are unreasonable?

"MR. BROOKS: We allege that they make excessive and unwarranted reductions in the Railroads' revenues, and therefore that they are unjust and unreasonable. I will say this, anticipating the argument, that is one thing I was coming to. I would like to point out to the Court at that time that the rate, in order to be compensatory in the legal sense, does not necessarily just have to cover the bare cost of performing the services.

"THE COURT: I recognize that.

"MR. BROOKS: All right.

"THE COURT: I just wanted to know.

"MR. BROOKS: We do not say to the Court that these rates are non-compensatory in the sense that they would not cover the cost, perhaps, of handling the goods, and therefore we do not raise the issue of confiscation. We do say that they result in drastic reduc-

tions that make them unjust and unreasonable."

The railways, in their brief, make the following comment in regard to this matter:

"We wish to make it absolutely clear, as was done in the record, that these railroad intervenors have not, as yet, alleged the purportedly prescribed rates are confiscatory or non-compensatory. It has been alleged that the rates are unjust and unreasonable. This state of the pleadings, we submit, does not in anyway constitute an admission, actual or implied, that the rates are compensatory, much less that they are fully compensatory.

"Whether the rates are compensatory or not, depends, at least in part, on whether they produce enough revenue to cover the cost of handling. In order to determine that fact, it is necessary to have evidence, not only to the amount of revenue received, but as to the expense involved in handling the traffic. Then, and only then, can the conclusion as to whether the rates are compensatory or non-compensatory be reached. We do not wish to in anyway mislead this court. Thus, it should not in anyway be understood that railroad intervenors at the trial on the merits will introduce evidence tending to show the expense of handling the traffic is in excess of the revenue received, but we do insist that under the state of the pleadings, even assuming no further amendment, railroad intervenors could introduce evidence concerning the cost involved in handling the traffic which could support a finding that the spread between the expense incurred and the revenue received is such the rates are unjust and unreasonable.

"The simple fact is that, contrary to the assertion in appellant's brief, it is not established in the record, at the present time, whether the rates are

compensatory or non-compensatory, and nothing said by counsel in response to the trial court's questions settles the question, one way or another. In addition, particular rates can be unjust and unreasonable even though they are compensatory."

We have made what we consider to be a full and fair statement of the essential facts before the Trial Court when it issued the injunction, the validity of which is before us and will now be determined.

█ The objection that the order of the Commission amends a tariff no longer in effect is, we believe, trivial under the record. The order purported to amend tariff R.C.T. 322. This tariff had been cancelled by R.C.T. 366, and it was this tariff which was actually amended by the order in suit.

The error was numerical only. This appears from the uncontroverted affidavit of Mr. McNamee. The substance, purport and effect of the order was plain and obvious. No one complains of being harmed by this most innocuous of errors. Besides, if there was no order to amend, the order in suit would be an original order, regardless of its nomenclature.

█ The objection to the order is that it applies to cast iron pipe when such commodity did not appear in the notice for the hearing at which the order was made. We quote from the affidavit of the Commission's Rate Division Director, Mr. McNamee, as to this objection:

"The Commission does not regard the order under attack in Cause No. 129,705, shown in Railroad Commission Docket 12819–R as prescribing any rates on cast iron pipe. The caption of the proceeding is, 'wrought iron and steel pipe.' When the order as a whole is read, I think it is plain that the Commission was dealing only with wrought iron pipe and not cast iron

pipe. If there still be any question about it the Commission has authorized me to state that it will authorize the tariff publishing agent to show that the rates are applicable only on wrought iron or steel pipe and not on cast iron pipe."

While neither the Commission nor the Director may judicially construe this order, it is our opinion that the order as a whole would not be rendered invalid by the omission from the notice of a commodity, but that the invalidity of the order would extend no further than to the commodity omitted from the notice. All parties seem to concede the invalidity of the order insofar as cast iron pipe is concerned if it in fact affects such pipe.[4] No authorities are cited to support the contention that this invalidity voids the entire order. We are unable to perceive of any good reason for this effect to follow. It is our opinion that the remainder of the order does not fall because of its conceded inapplicability to cast iron pipe.

█ The objections to the order of the Commission based on the methods employed, or the criteria used, by the Commission in arriving at the rates prescribed by it are beyond the scope of judicial review. In Railroad Commission v. Galveston Chamber of Commerce, 105 Tex. 101, 145 S.W. 573, the Court stated:

"It is not within the language nor the spirit of the law, which authorizes the courts to review the action of the Railroad Commission, that any court should investigate the methods adopted by the Commission in fixing its rates, nor the motives or purposes which prompted such action. The result and its effect upon the rights of railroads and shippers mark the limit of judicial inquiry."

The remaining objections to the order of the Commission are matters of substance

4. Railroad Comm. of Tex. v. National Transport Corp., 363 S.W.2d 360, Austin Civil Appeals, writ ref., n. r. e.

and are properly presented under Arts. 6453–6454, V.A.C.S. Art. 6453 provides, in part, that any party at interest who is dissatisfied with any order of the Commission prescribing railroad rates may appeal to the Courts, and Art. 6454, provides that the burden shall be on the complaining party to show that such rates "are unreasonable and unjust to it or them."

As to the Railroad appellees it is abundantly clear that they neither plead nor prove, nor do they even promise to plead or prove that the railroad carload rates prescribed by the Commission are confiscatory or non-compensatory. They do assert that rates can be "unjust and unreasonable though they are compensatory." No authorities are cited to support this assertion. We believe this statement to be erroneous. In Texas & New Orleans Railroad Co. v. Railroad Comm., 155 Tex. 323, 286 S.W.2d 112, the Court stated:

"Freight rates should be fair and nondiscriminatory between shippers similarly situated and between geographical locations. They should be based upon the carrier's cost of operation plus a fair profit. Any greater charge would constitute a subsidy to the carrier made for the purpose of favoring and protecting some industry or locality or maintaining an artificial price level and would constitute discrimination. * * *

"There is nothing in [cases discussed] which deprives a rate-making agency of the authority to reduce rates on a particular commodity simply because the reduction will result in a loss of revenue to railroads whose return on investment is already low. Unless the rate fixed on the particular commodity is unreasonable and unjust, the railroads should not be heard to complain of it simply because it results in a loss of revenue. They have their remedy under the statutes in seeking a general revenue increase in rates."

If the rates here are compensatory to the Railroads within the rule of the above (T. & N. O.) case then it is not possible for them to be unreasonable or unjust to them. If the rates are inadequate under the test of this case then they would be either unreasonable or unjust or perhaps confiscatory. Texas & N. O. Ry. Co. v. Sabine Tram Co., 61 Tex.Civ.App. 353, 121 S.W. 256, writ ref. If they are excessive under such rule, then they, as stated, are invalid. "The public is entitled to demand that no more shall be extracted from it than the services [transportation of freight] are reasonably worth * * *." 10 C.J., p. 418, quoted with approval by this Court in Abilene & So. Ry. v. Terrell, Tex.Civ.App., 131 S.W.2d 37, writ ref.

It is our opinion that the Railroad appellees have shown neither a probable right nor a probable injury to justify the issuance of the temporary injunction by the Trial Court.

The motor carrier appellees have unquestionably established the probability of injury from enforcement of the rate order of the Commission if it becomes effective. We are convinced, however, that they have not shown a probable right which will be violated by the enforcement of such order. It is our opinion that their right to avoid these injuries, or even their right of survival, must be viewed from the standpoint of public interest, free enterprise, and our competitive economic system. Assuming that the rates prescribed by the Commission for railroads are fairly compensatory to them, paying them a reasonable return for their services, then the question presented is whether or not the public should be deprived of these beneficial rates because of injuries to be sustained by less efficient carriers. If this question is resolved favorably to appellee motor carriers, then obsolescence in this area is perpetuated and progress arrested. This would be detrimental to the public interest. We believe that the injuries to be sustained by appellee motor carriers repre-

sent the price they must pay for their confessed inability to be competitive in this area.

Not too many years ago (1951) numerous railroads, including some of the railroad intervenors here, protested the action of the Commission in granting to certain specialized motor carriers authority to transport certain chemicals on the ground, among others, that "said rail lines received a large revenue for the transportation of chemicals in Texas; that the transportation of chemicals is attractive traffic, and that the diversion of the transportation of the tonnage now being transported by said companies would seriously affect the service now being rendered by them; that such traffic is very material to the rail lines; that the rail lines have quite an investment in the terminals located at different points on their lines, and that some of said terminals would have to be abandoned if they lose the chemical traffic; that the revenue received from the transportation of chemicals is a substantial part of the total revenue received by some of said rail lines; that if they lose the chemical transportation they might have to operate a less number of trains and curtail their service to the public; * * *"

This protest was overruled by the Commission and approved by this Court in Thompson v. Railroad Commission, Tex. Civ.App., 232 S.W.2d 139, reversed on other grounds, 150 Tex. 307, 240 S.W.2d 759. The complaint here is the same; only the complainant is different. This should not alter the law.

We believe the correct principle to be applied here was stated by Justice Baugh for this Court in Texas Motor Coaches v. Railroad Commission, Tex.Civ.App., 59 S.W.2d 923, aff., 123 Tex. 517, 73 S.W.2d 511, in this language:

"If public convenience and need outweigh, as the trial court and the commission found in this case that it did, the private interests of those already in the field, the latter become subservient to the former, and must abide the result even though it involve financial loss. All these things, and the weight to be given them, were matters within the scope of the powers delegated to the commission to determine; and, unless the commission abused its discretion in the conclusions reached, the courts are not at liberty to set aside the result."

As illustrative of the principle which we apply here, we quote from Missouri Pacific Railroad Company v. United States, 203 F.Supp. 629, 635, U. S. District Court, E.D.Mo.:

"The general rule is that all relevant factors of the NTP must at least be considered by the ICC in proceedings involving the reasonableness of rail rates. Cantlay & Tanzola v. United States, D.C., 115 F.Supp. 72, 79, l. c. 81. The Commission has considered the NTP's prohibition of 'destructive competitive practices' to the exclusion of all else, but other elements of the NTP dictate the preservation and not the cancellation of the rates. For example, it states:

"'It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act * * * so administered as to recognize and preserve the inherent advantages of each * * *.'

"Preservation of inherent advantage is thus recognized by the NTP. It has also been recognized by the Supreme Court in Schaffer Transportataion Co. v. United States, 355 U.S. 83, l. c. 91, 78 S.Ct. 173, l. c. 178, 2 L.Ed.2d 117, where it was said:

"'The ability of one mode of transportation to operate with a rate lower than competing types of transportation is precisely the sort of "inherent advantage" that the congressional policy requires the Commission to recognize.'

"It is the rails' inherent advantage of being able to haul increasingly heavy loads at reduced rates which is being asserted in the instant rates. It is evident that in the demonstrated absence of any destructive competition, there are no grounds for precluding such assertion. Cancellation of the proposed rates would hinder competition fostered by Section 15a(3) and destroy, not preserve, inherent advantage."

The real question presented by this appeal is of basic importance. If it should be held that, as a matter of law, reduced but compensatory transportation rates may not be initiated for the sole reason that they may deleteriously affect a carrier who is unable to compete with them, then it should now be known in order that proposed canalizing of the Trinity, San Antonio and other waterways at the cost of billions of dollars will not be undertaken in the mistaken belief that the cheap transportation thereby created can be effectively utilized.

The order before us was signed by the Railroad Commission Chairman, the Hon. Wm. J. Murray, Jr., and Commissioner, the Hon. Ben Ramsey, and in our opinion they, in adopting such order, have acted legally reasonably and in accordance with their responsibility as guardians of the public interest in the field of transportation rate regulation.

It follows that, in our opinion, appellees have failed to establish a probable right justifying equitable interposition in their behalf for its protection.

The judgment of the Trial Court is reversed and the temporary injunction granted by it is dissolved.

Reversed. Temporary Injunction dissolved.

## ON MOTION NO. 12,839 FOR STAY

PER CURIAM.

Appellees herein having filed a Motion that we stay our order dissolving the temporary injunction granted by the Trial Court pending further proceedings herein, and appellant interposing no objection, and the Court having considered such Motion, It is ordered that such Motion be and the same is hereby granted and our order dissolving such injunction is stayed: (1) Until time for filing Motions for Rehearing herein have expired without any such Motion being filed (2) If such Motions are filed until such Motion or Motions are acted on by this Court (3) If such Motions are overruled, then until time for filing application for writ of error to the Supreme Court has expired without such application being filed (4) If such application is filed, then until such application is acted on by the Supreme Court of Texas.

## ON MOTION FOR REHEARING

HUGHES, Justice.

Appellees' Motions for Rehearing reflect that we are embroiled in a war of words. The Railroads say, "It will be seen that the Supreme Court [Texas & N. O. v. R. R. Comm., 155 Tex. 323, 286 S.W.2d 112] contrary to this Court's decision, does not equate 'confiscatory' and 'unreasonable and unjust.'" They also say, "A noncompensatory rate obviously is one that takes property without proper compensation or without due process of law."

In our opinion we said, "If the rates here are compensatory to the Railroads within the rule of the above (T. & N. O.) case then it is not possible for them to be unreasonable or unjust to them." (The Railroads)

The rule we referred to, and which was stated in the preceding paragraph, was, the Supreme Court speaking, "Freight rates should be fair and nondiscriminatory between shippers similarly situated and between geographical locations. *They should be based upon the carrier's cost of operation plus a fair profit.*" Italics ours.

If a rate meets this test it is not unreasonable nor unfair to the carriers

_harging the rate. It is fully compensatory. This is all we intended to say or hold. We do not equate the word "compensatory" nor the words "unreasonable" and "unjust" with the word "confiscatory." We agree with Railroads that a "non-compensatory rate" is one which does not provide "proper compensation" to the carrier. By "proper compensation" we mean cost of operation plus a fair profit.

Railroads make the point that in any event we should not have dissolved the injunction in so far as it related to rates on cast iron pipe. We sustain this assignment. The invalidity or inapplicability of the order of the Commission as to rates prescribed for the transportation of cast iron pipe is conceded by all parties. The injunction as to such rates was properly granted, and should remain in force.

In the respect indicated, the Motions for Rehearing are granted; in all other respects they are overruled.

Granted in part and in part overruled.